685 S.E.2d 570 (2009)
Nancy HENSLEY, Diane Kent, and Clean Water for North Carolina, Inc., Petitioners-Appellants,
v.
NORTH CAROLINA DEPARTMENT OF ENVIRONMENT AND NATURAL RESOURCES, Division of Land Resources, Respondent-Appellee, and
Mountain Air Development Corporation, Respondent-Intervenor.
No. COA08-1307.
Court of Appeals of North Carolina.
November 17, 2009.
*574 Southern Environmental Law Center, by J. Blanding Holman, IV, Julia F. Youngman, and Geoffrey R. Gisler, Chapel Hill, for Petitioners-Appellants.
Attorney General Roy Cooper, by Assistant Attorney General Edwin Lee Gavin II and Assistant Attorney General Sueanna P. Sumpter, for Respondent-Appellee.
Smith Moore Leatherwood, LLP, by Ramona Cunningham O'Bryant; and McGuirewoods, LLP, by Benne C. Hutson, for Respondent-Intervenor.
McGEE, Judge.
Mountain Air Development Corporation (Mountain Air) owns Mountain Air Country Club in Yancey County. At the time the dispute in this case arose, Mountain Air Country Club included a lodge, an eighteen-hole golf course, residences, and a private airstrip. Mountain Air sought approval in 2003 to construct a nine-hole golf course along and over Banks Creek, certified trout waters (trout waters), as defined by 15A N.C.A.C. 2B.0304 (a)(1). Mountain Air sought approval of a variance from the Sedimentation Control Commission (the Commission) of the Division of Land Resources, a division of the Department of Environment and Natural Resources ((DENR), and along with Mountain Air, (Respondents)). The variance was required to conduct land-disturbing activities during periods of construction within the mandatory buffer zone provided for in N.C. Gen.Stat. § 113A-57(1) of Article 4, Chapter 113A of the North Carolina General Statutes: the "Pollution Control and Environment Sedimentation Pollution Control Act of 1973" (the Act).
Trout waters, such as Banks Creek, are "[s]uitable for natural trout propagation and maintenance of stocked trout[,]" 15A N.C.A.C. 2B.0301(c), and constitute "freshwaters protected for natural trout propagation and survival of stocked trout." 15A N.C.A.C. 2B.0101 (e)(1). Banks Creek is also "protected for secondary recreation, fishing, aquatic life including propagation and survival, and wildlife." 15A N.C.A.C. 2B.0101(c)(1).
*575 The Commission granted Mountain Air's request for a variance from the buffer requirements mandated in N.C. Gen.Stat. § 113A57 (1). Mountain Air then proceeded to remove trees and tree canopy along 2, 763 feet of Banks Creek, and to clear all buffer vegetation along 160 feet of Banks Creek. Mountain Air also temporarily diverted the course of a section of Banks Creek through pipes eighteen inches in diameter in order to install 1,868 feet of underground pipes, some as small as 36 inches in diameter. Finally, Mountain Air redirected that section of Banks Creek into the underground pipe system, and began construction of a fairway over a section of the piped trout waters.
Clean Water for North Carolina, Inc. (Clean Water) is a public interest group that provides support to local community efforts on issues related to water-quality, and has members who live on or near Banks Creek, including Nancy Hensley and Diane Kent (together with Clean Water, "Petitioners").
Petitioners filed a petition for a contested case hearing in the Office of Administrative Hearings on 12 November 2003, challenging the variance granted by the Commission to Mountain Air. Petitioners allege that Mountain Air's actions violate relevant statutes, will have a negative impact on Banks Creek, and will "significantly adversely impact [their] ability to use and enjoy their property." Mountain Air moved to intervene, and its motion was granted on 7 January 2004.
Petitioners and Respondents filed cross-motions for summary judgment, which were heard on 4 August 2004. By order filed 12 January 2006, Administrative Law Judge James L. Conner, II (the ALJ), granted both Petitioners' and Respondents' motions in part and denied both in part, ruling that genuine issues of material fact existed with respect to certain issues included in the motions for summary judgment. Relevant to this appeal, the ALJ ruled that N.C. Gen. Stat. § 113-57(1) prohibited the actions undertaken by Mountain Air, stating after lengthy analysis:
[T]he straightforward interpretation of N.C. Gen.Stat. § 113-57(1) that I have set out above not only gives the terms of the statute their most natural and direct meaning, it also carries forward the intent of the statute. Development is prohibited in the buffer zones except in exceptional circumstances: truly temporary and minimal incursions that are approved by the Commission (such as travel across the buffer by heavy equipment for staging purposes, with appropriate protections to assure that the sedimentation is minimal); facilities located on, over, or under a watercourse, which cannot logically have a buffer (such as docks and bridges); and land-disturbing activity in connection with the latter (such as roads leading to bridges).
Respondents filed a "Motion for Reconsideration of Order and for Certification to N.C. Sedimentation Control Commission" on 12 April 2006. Petitioners and Respondents joined in a consent order on 27 September 2006, which certified the matter to the Commission for a final agency decision. The Commission entered its final decision on 19 January 2007, in which it overruled the ALJ on the issue of whether Mountain Air's actions within the buffer zone were temporary and minimal, and entered summary judgment in favor of Respondents on that issue. Petitioners appealed the final agency decision to the Superior Court of Wake County. The trial court affirmed the final agency decision by order filed 2 July 2008, entering "summary judgment ... in favor of [Respondents] on all matters raised in the Petition for Judicial Review." Petitioners appeal.
We note that the Additional Factual and Procedural Background provided by the dissent may show that Mountain Air obtained the appropriate certifications and permits from other agencies before commencing construction of the project. These additional facts may also show that Mountain Air made considerable efforts to minimize the potential for sedimentation runoff during the main construction phase of the project, and that the Commission subjected Mountain Air to stringent requirements in an effort to minimize sediment runoff. Further, whether or not waters certified as trout waters actually currently contain trout is beyond the scope of this appeal. We are confined to making a determination based upon the classification of the waters made by the State of North *576 Carolina, and are without authority to question that determination in this appeal. Certifications and permits issued by other agencies are not relevant to our determination of whether the variance granted by the Commission was proper. Nor may stringent conditions placed upon an improperly granted variance transform it into a properly granted variance. We do not find the additional facts included in the dissent's argument relevant to this appeal.

I.
"Section 150B-51(c) dictates the standard of judicial review in cases in which the agency does not adopt the ALJ's decision. N.C.G.S. § 150B-51(c)." Cape Med. Transp., Inc. v. N.C. HHS, 162 N.C.App. 14, 21, 590 S.E.2d 8, 13 (2004).
As provided in section 150B-51(c), in its de novo review of an agency decision declining to adopt the ALJ's decision, the trial court "shall make findings of fact and conclusions of law ... and shall not be bound by the findings of fact ... in the agency's final decision." N.C.G.S. § 150B-51(c) (emphasis added). The plain language of the section permits the trial court to review the official record and make its own findings of fact and conclusions of law, without giving deference to any prior agency or ALJ decision. "De novo review requires a court to consider the question anew, as if the agency has not addressed it." "Presumably, [section 150B-51(c)] makes clear that unlike the de novo review of questions of law under the traditional standard of review, in which the court might in some cases give `some deference' even to questions of law, such deference is not to be given to any aspect of any prior decision in the case."
The legislative intent behind section 150B-51(c) is to increase the judicial scope of review in cases in which an agency rejects the ALJ's decision. Before the enactment of section 150B-51(c), "the standard of review for findings of fact [in the final agency decision] was very deferential [to the agency]."
We acknowledge our Courts have previously held that an agency's findings of fact if not objected to constituted the whole record and were binding on appeal. However, these cases were decided before section 150B-51(c) came into effect and are thus not applicable here. Therefore, consistent with section 150B-51(c), the trial court is permitted to make its own findings of fact, even though neither party objected to those findings.
Id. at 21-22, 590 S.E.2d at 13-14 (internal citations omitted); see also Rainey v. N.C. Dep't of Pub. Instruction, 361 N.C. 679, 680, 652 S.E.2d 251, 252 (2007). When our Court reviews
a superior court order regarding an agency decision, "the appellate court examines the trial court's order for error of law. The process has been described as a twofold task: (1) determining whether the trial court exercised the appropriate scope of review and, if appropriate, (2) deciding whether the court did so properly."
Mann Media, Inc. v. Randolph County Planning Bd., 356 N.C. 1, 14, 565 S.E.2d 9, 18 (2002) (citations omitted); see also McHugh v. North Carolina Dep't of Envtl., Health & Natural Resources, 126 N.C.App. 469, 474, 485 S.E.2d 861, 864 (1997). "The standard of review on a summary judgment motion is whether there is a genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law." Cornett v. Watauga Surgical Group, P.A., ___ N.C.App. ___, ___, 669 S.E.2d 805, 811 (2008).
The case before us involves interpretation of N.C. Gen.Stat. § 113A-57(1).
When construing statutes, [the appellate] Court first determines whether the statutory language is clear and unambiguous. If the statute is clear and unambiguous, we will apply the plain meaning of the words, with no need to resort to judicial construction. "However, when the language of a statute is ambiguous, this Court will determine the purpose of the statute and the intent of the legislature in its enactment." [] "The best indicia of [legislative] intent are the language of the statute or ordinance, the spirit of the act and what the act seeks to accomplish."
*577 Wiggs v. Edgecombe County, 361 N.C. 318, 322, 643 S.E.2d 904, 907 (2007) (internal citations omitted); see also Carolina Power & Light Co. v. City of Asheville, 358 N.C. 512, 518, 597 S.E.2d 717, 722 (2004) ("If the language is ambiguous or unclear, the reviewing court must construe the statute in an attempt not to `defeat or impair the object of the statute ... if that can reasonably be done without doing violence to the legislative language.'") (citation omitted). We review de novo issues of statutory interpretation. R.J. Reynolds Tobacco Co. v. N.C. Dep't of Env't & Natural Res., 148 N.C.App. 610, 616, 560 S.E.2d 163, 167 (2002); see also In re Proposed Assessments of Additional Sales & Use Tax v. Jefferson-Pilot Ins. Co., 161 N.C.App. 558, 559, 589 S.E.2d 179, 180 (2003).

II.
Petitioners argue on appeal that the trial court erred in concluding that the land-disturbing activities in this case were "temporary" and "minimal" and thus authorized by N.C. Gen.Stat. § 113A-57(1). We agree.
N.C. Gen.Stat. § 113A-57, "Mandatory Standards for Land-Disturbing Activity," states in relevant part:
No land-disturbing activity subject to this Article shall be undertaken except in accordance with the following mandatory requirements:
(1) No land-disturbing activity during periods of construction or improvement to land shall be permitted in proximity to a lake or natural watercourse unless a buffer zone is provided along the margin of the watercourse of sufficient width to confine visible siltation within the twenty-five percent (25%) of the buffer zone nearest the land-disturbing activity. Waters that have been classified as trout waters by the Environmental Management Commission shall have an undisturbed buffer zone 25 feet wide or of sufficient width to confine visible siltation within the twenty-five percent (25%) of the buffer zone nearest the land-disturbing activity, whichever is greater. Provided, however, that the Sedimentation Control Commission may approve plans which include land-disturbing activity along trout waters when the duration of said disturbance would be temporary and the extent of said disturbance would be minimal. This subdivision shall not apply to a land-disturbing activity in connection with the construction of facilities to be located on, over, or under a lake or natural watercourse.
N.C. Gen.Stat. § 113A-57(1) (2007). Land-disturbing activity is defined in relevant part as: "any use of the land by any person in ... commercial development ... that results in a change in the natural cover or topography and that may cause or contribute to sedimentation." N.C. Gen.Stat. § 113A-52(6) (2007).
We hold that the completed actions of Mountain Air: removing or reducing ground cover in buffer zones, replacing forested land with fairways, re-routing portions of Banks Creek, and re-diverting the creek through underground piping, constituted "land-disturbing activity." These actions clearly changed the natural ground cover and topography, and undoubtedly had the potential to "cause or contribute to sedimentation."[1] In its "Overview of Pipe Installation Strategy," Mountain Air stated that it had "determined that by creating work teams the chance of sediment leaving the site will be reduced." (Emphasis added). This is an admission that though they believed their strategy would reduce the chance of sediment leaving the site  which was in the trout waters buffer zone  the chance of sediment leaving the site of the land-disturbing activities was still a real possibility.
The trial court found that "Mountain Air [would] only be conducting a `land-disturbing activity' (i.e., an activity that 'may cause or contribute to sedimentation') while doing construction in the trout buffer." The trial court also found "no evidence in the record that there [would] be the potential for or actual sedimentation after the work in the *578 trout buffer [was] completed and stabilized." However, these findings are not supported by competent evidence in the record.
The evidence in the record shows that Mountain Air will continue to conduct activity in the trout waters buffer zone after completion of all construction. Specifically, Mountain Air will have to periodically remove trees and tree canopy in order to maintain the functionality of the golf course, and maintenance and repair of culverts and piping will also be required. We hold, as a matter of law, that this ongoing activity "may cause or contribute to sedimentation" (emphasis added), and thus constitutes ongoing "land-disturbing activity."
N.C. Gen.Stat. § 113A-57(1) clearly and unambiguously mandates two different standards for land-disturbing activity, depending on whether the fresh waters involved have been classified as "trout waters." The statute is also clear on its face that the buffer zone required for classified trout waters is more stringent than that mandated for other fresh waters. Respondents admitted that "[m]ore stringent buffer requirements apply to watercourses classified as trout waters" in their "Motion for Reconsideration of Order and for Certification to N.C. Sedimentation Control Commission." Respondents also admit in their brief that the trout waters provision of N.C. Gen.Stat. § 113A-57(1) is a more stringent regulation.
The requirement for fresh waters in general is a buffer zone "of sufficient width to confine visible siltation within the twenty-five percent (25%) of the buffer zone nearest the land-disturbing activity." N.C. Gen.Stat. § 113A-57(1). However, the statute further mandates that classified trout waters "shall have an undisturbed buffer zone 25 feet wide or of sufficient width to confine visible siltation within the twenty-five percent (25%) of the buffer zone nearest the land-disturbing activity, whichever is greater."
The dissent states that there "is no authority in the General Statutes, or in the regulations for" the proposition that buffer zones along trout streams "be maintained in a natural, pristine state in perpetuity." The dissent seems troubled by the idea that the mandatory language of N.C. Gen.Stat. § 113A-57(1), requiring an undisturbed buffer zone, would leave this buffer zone in place "in perpetuity." We would suggest the language of N.C. Gen.Stat. § 113A-57(1) cited directly above is a clear pronouncement by the General Assembly that, subject to certain limited exceptions, mandatory trout waters buffer zones shall remain "undisturbed" in perpetuity, or until such time as the General Assembly decides to enact legislation to the contrary. Were we to ignore the plain language of the statute, we would be intruding into the province of the General Assembly, which, as the dissent correctly points out, is counter to the authority of this Court. We find nothing unusual about this restriction being placed in a statute dealing with sedimentation control through the regulation of land-disturbing activities, as the General Assembly has determined that such activities, and the sediment they may produce, constitute one of the primary threats to trout waters, and fresh waters in general. N.C. Gen.Stat. § 113A-51 (2007).
The plain language of N.C. Gen.Stat. § 113A-57(1) requires an undisturbed twenty-five foot buffer zone, or, if twenty-five feet is insufficient, a larger undisturbed buffer zone, between classified trout waters and land-disturbing activity. This mandatory buffer zone may only be violated by "temporary and minimal" land-disturbing activity when specifically authorized by the Commission. The exclusionary clause reads: "Provided, however, that the Sedimentation Control Commission may approve plans which include land-disturbing activity along trout waters when the duration of said disturbance would be temporary and the extent of said disturbance would be minimal." "Said disturbance" can only refer to "land-disturbing activity," which is the only "disturbance" mentioned in the exclusionary clause, and indeed, in the whole of N.C. Gen.Stat. § 113A-57(1). N.C. Gen.Stat. § 113A-57(1) requires that, even with approval from the Commission, land-disturbing activity within the mandatory undisturbed buffer zone, whether it be twenty-five feet or larger, must be both temporary and minimal.
There is nothing in the plain language of N.C. Gen.Stat. § 113A-57(1) that contemplates *579 disturbance in the mandatory buffer zone protecting classified trout waters beyond the "temporary and minimal" exception. Clearly, land-disturbing activity that permanently removes the mandatory undisturbed buffer zone for trout waters from portions of trout waters far exceeds the authority granted in N.C. Gen.Stat. § 113A-57(1) for temporary and minimal land-disturbing activities within the buffer zone.
Mountain Air conducted land-disturbing activity as defined by N.C. Gen.Stat. § 113A-52(6) within the mandatory buffer zone on 4,791 feet of Banks Creek. Mountain Air completely removed 160 feet of the mandatory undisturbed buffer zone of Banks Creek by clearing all vegetation. Mountain Air further removed trees and tree canopy within the buffer zone along 2, 763 feet of Banks Creek. Mountain Air also re-routed a portion of the trout waters and installed 1,868 feet of underground piping, finally re-directing the stream through the permanent piping. This land-disturbing activity cannot be deemed "minimal" by any reasonable definition of that word. 15A N.C.A.C. 4B.0125(c) provides specific guidance on what may be considered "minimal" disturbance within a trout water buffer zone:
Where a temporary and minimal disturbance is permitted as an exception by G.S. 113A-57(1), land-disturbing activities in the buffer zone adjacent to designated trout waters shall be limited to a maximum of ten percent of the total length of the buffer zone within the tract to be distributed such that there is not more than 100 linear feet of disturbance in each 1000 linear feet of buffer zone. Larger areas may be disturbed with the written approval of the Director [of the Division of Land Resources of the Department of Environment, Health, and Natural Resources. 15A N.C.A.C. 4A.0105(26)].
15A N.C.A.C. 4B.0125(c). By Mountain Air's own calculations, the total trout water length within the tract disturbed is 21,526 linear feet. Mountain Air has conducted land-disturbing activities  removal of all natural ground cover from the buffer zone, tree and tree canopy removal in buffer zone, and re-routing Banks Creek to enable pipe placement  that affect 4,791 linear feet of the trout waters on the property. That constitutes land-disturbing activity on over twenty-two percent of the trout waters buffer zone within the tract to be disturbed. There is nothing in the record to show that Mountain Air received written approval of the Director to exceed the limits mandated by 15A N.C.A.C. 4B.0125(c).[2]
We cannot agree with the dissent's argument that, because respondent issued a variance pursuant to 15A N.C.A.C. 4B.0125(c), this variance automatically constituted "written approval of the Director." 15A N.C.A.C. 4B.0125(c) unambiguously requires "written approval" for any variance exceeding the "temporary and minimal" standard set forth in N.C. Gen.Stat. § 113A-57(1). There is nothing in the language of 15A N.C.A.C. 4B.0125(c) to suggest approval may be implied. Contrary to the assertion of the dissent, the variance issued by Respondent does not indicate that Mountain Air made any request to exceed the ten percent maximum, nor that Respondent ever considered the fact that Mountain Air would be exceeding that maximum. Respondent did not address any exception to the ten percent maximum in the variance it granted, and therefore did not give Mountain Air written permission in that variance to exceed the ten percent maximum mandated by 15A N.C.A.C. 4B.0125(c). Mountain Air needed to request approval from the Director, and the Director was required to grant specific approval, in writing. Therefore, pursuant to N.C. Gen.Stat. § 113A-57(1) and 15A N.C.A.C. 4A.0105(26), the land-disturbing activities conducted by Mountain Air during construction of the project were not "minimal," and no variance should have been granted by the Commission.
*580 Furthermore, the evidence shows that this land-disturbing activity was meant to be permanent, or to continue for at least as long as the projected nine-hole golf course remained in use. Respondents do not argue that the changes they have made, or will make, to the mandatory undisturbed buffer zone are in any manner "temporary." Respondents base their argument on their contention that the "minimal and temporary" language in N.C. Gen.Stat. § 113A-57(1) refers to the effects of sedimentation runoff, not land-disturbing activity within the buffer zone. We have already rejected this argument based upon the plain meaning of the statute.
Further, there is no authority in the statutes or the administrative code authorizing relocation of a trout water in this case. 15A N.C.A.C. 4B.0112 states:
Land disturbing activity in connection with construction in, on, over, or under a lake or natural watercourse shall minimize the extent and duration of disruption of the stream channel. Where relocation of a stream forms an essential part of the proposed activity, the relocation shall minimize unnecessary changes in the stream flow characteristics.
15A N.C.A.C. 4B.0112 (emphasis added). This provision is limited to that part of N.C. Gen.Stat. § 113A-57(1) concerning land-disturbing activities "on, over, or under a lake or natural watercourse" ("This subdivision shall not apply to a land-disturbing activity in connection with the construction of facilities to be located on, over, or under a lake or natural watercourse." N.C. Gen.Stat. § 113A-57(1).). Therefore, 15A N.C.A.C. 4B.0112 only applies to those activities which are specifically exempted from the "temporary and minimal" requirements of N.C. Gen. Stat. § 113A-57(1). Respondents made no argument to the trial court, and no argument is made on appeal, that this section of N.C. Gen.Stat. § 113A-57(1) applies in this case.
Neither the statutes nor the administrative code contain any similar authorization for the re-routing of fresh waters for land-disturbing activities not covered by the "on, over, or under" exemption of N.C. Gen.Stat. § 113A-57(1). Therefore, the rerouting of a portion of Banks Creek in itself constituted a violation of the provisions of the Act, and the Commission was without authority to approve a variance which contained this kind of land-disturbing activity within the mandatory trout buffer zone. The trial court erred in granting summary judgment in Respondents favor.
The dissent seems to imply that we are addressing an argument Petitioners abandoned at the trial level by considering the "on, over, or under" exemption of N.C. Gen. Stat. § 113A-57(1). However, we make no holding in this opinion on the argument Petitioners abandoned before the trial court. In fact, Petitioners stated "issue to be resolved" in their prehearing statement concerning this issue is: "G.S. 113A-57(1) states there can be no 'land-disturbing activity in connection with the construction of facilities to be located on, over, or under a lake or natural watercourse.'" Although this issue is not before us on appeal, our analysis of this section in support of our reading of the contested portion of N.C. Gen.Stat. § 113A-57(1) clearly rejects Petitioner's arguments before DENR on this point.
We conduct de novo review of matters of statutory construction. It is entirely appropriate to look to other related statutory provisions when making our intent based analysis of N.C. Gen.Stat. § 113A-57(1), which we do below. We find particularly confusing the dissent's subsequent use of this portion of N.C. Gen.Stat. § 113A-57(1) to support its belief that "construction of a golf-course `over' the stream falls within this specific exception."
We find the dissent's conclusion that the General Assembly intended to include golf courses within the "on, over, or under" exemption of N.C. Gen.Stat. § 113A-57(1) renders the protections provided by N.C. Gen.Stat. § 113A-57(1) virtually meaningless. As the ALJ reasonably interpreted this portion of the statute, the "on, over, or under" exemption logically refers to bridges, docks, [or conduits for sewage, water or electrical lines and other structures] that must necessarily "cross" or rest upon waters of North Carolina. Pursuant to the dissent's interpretation, constructing any structure *581 within the mandatory buffer zones would always be permitted so long as the waterway was diverted to run beneath the structure, and any such land-disturbing activity would be permitted without any regard to the effects of sedimentation caused by that construction. Furthermore, as the dissent itself argues, whether this section might provide specific grounds for the issuance or refusal of the variance is an issue not before us. Its only relevance is in assisting in the interpreting of those portions of N.C. Gen.Stat. § 113A-57(1) that are actually before us on appeal.
We hold that the trial court's finding that "Mountain Air [would] only be conducting a `land-disturbing activity' (i.e., an activity that `may cause or contribute to sedimentation') while doing construction in the trout buffer" is not supported by substantial evidence. The trial court's finding that there is "no evidence in the record that there [would] be the potential for or actual sedimentation after the work in the trout buffer [was] completed and stabilized" was in error for the same reason. The substantial evidence in the record shows that Mountain Air will continue to conduct activity in the trout water buffer zone after completion of initial construction of the project. Specifically, Mountain Air will have to periodically remove trees and tree canopy in order to maintain the functionality of the golf course, and maintenance and repair of culverts and piping will also be required.[3] "`Completion of Construction or Development' means that no further land-disturbing activity is required on a phase of a project except that which is necessary for establishing a permanent ground cover." 15A N.C.A.C. 4A.0105(23) (emphasis added). Mountain Air's ongoing activities within the trout waters buffer zone will serve to reduce the effectiveness of the buffer zone in preventing sedimentation, and cannot be interpreted as actions "necessary for establishing a permanent ground cover." We hold, as a matter of law, that this ongoing activity "may cause or contribute to sedimentation" (emphasis added), and thus constitutes "land-disturbing activity." N.C. Gen. Stat. § 113A-52(6). We further hold that by definition, this continuing land-disturbing activity means the "construction or development" will not be "completed" unless and until the nine-hole golf course ceases operation, because Mountain Air (or any successor) will continue land-disturbing activities within the buffer zone in order to keep the golf course functional. 15A N.C.A.C. 4A.0105(23).
We reiterate that violations of the provisions N.C. Gen.Stat. § 113A-57(1) cannot be ignored even if great care is taken when violating the statute. The dissent argues that extraordinary measures will be taken in an attempt to minimize negative impact in the buffer zone area. However, removal of tree canopy may result in more rain reaching the ground in the buffer zone unimpeded, and thus with increased force. This may lead to erosion and sedimentation of the trout waters. Removal of trees obviously may lead to the same result. Tree stumps and root mass eventually rot, and thus no longer serve to either check the flow of water over the buffer zone, nor serve to bind the soil. This may lead to sedimentation of the trout waters. Repair or maintenance of piping may require the removal of damaged or deteriorating piping and replacement with new piping. Both the digging and the removal would likely require heavy machinery. However done, this process certainly may lead to sediment entering the trout waters. These constitute land-disturbing activities, N.C. Gen.Stat. § 113A-52(6), and, as they will be ongoing, by definition the construction phase of the project will continue as long as these land-disturbing activities are *582 ongoing. 15A N.C.A.C. 4A.0105(23) ("`Completion of Construction or Development' means that no further land-disturbing activity is required on a phase of a project except that which is necessary for establishing a permanent ground cover.").
The dissent argues that the above analysis constitutes inappropriate "fact-finding" by this Court. However, we are not required to determine whether Mountain Air's activities have or will contribute to sedimentation, and we do not do so. What is clear to us, however, is that Mountain Air cannot prove that its activities could never contribute to sediment entering the trout waters. In light of this, we are compelled to hold that Mountain Air's activities may contribute to sediment entering the trout waters.
The fact that Mountain Air has enclosed 1,868 feet of the trout waters in underground pipes does not save it from the plain language of the statute. Even assuming arguendo that piping 1,868 feet of the trout water is an effective means of preventing sedimentation from entering the stream, the statute regulates "land-disturbing activity." We have already held that the land-disturbing activities utilized to place the pipe, including the rerouting of portions of Banks Creek, violated N.C. Gen.Stat. § 113A-57(1). Further, there has been no argument made, nor is it logical to conclude, that burying the stream and routing it through piping alters the classification of the stream from trout waters to another kind of watercourse.
Trout waters "shall have an undisturbed buffer zone 25 feet wide or of sufficient width to confine visible siltation within the twenty-five percent (25%) of the buffer zone nearest the land-disturbing activity, whichever is greater." N.C. Gen.Stat. § 113A-57(1) (emphasis added). The statute makes no exception for trout waters that have been buried. The use of the piping itself could cause or contribute to sedimentation of Banks Creek. For example, a storm could lead to blockage of a pipe causing backup, and flooding across and over the piped portion of the creek, which could accumulate sediment that would then be deposited into the downstream portion of the creek where the piping ends. In the alternative, heavy rains causing flooding may be forced through unblocked piping with increased velocity due to the force exerted by the accumulating water on the upstream end of the piping. This would result in water exiting the piping downstream at increased velocity, which certainly presents the possibility of heightened erosion and sedimentation that would not occur absent the piping. We cannot say that the use of piping presents no hazard of increased sedimentation. Therefore, we must find that the use of piping may cause increased sedimentation in the trout waters.
The dissent considers the above analysis speculative "concerning the possibility" that the piping may contribute to sedimentation, and argues that "[t]his speculation is beyond the scope of the permit before this Court." That the piping will at some point in time deteriorate and require maintenance if it is to continue functioning is not speculation, since it will not last forever. We must apply the law before us. If Mountain Air continues to operate the golf course for a long enough period of time, it will eventually need to repair or replace the existing piping. This certainly may lead to sediment entering the trout waters. If Mountain Air ceases to operate the golf course, maintenance will fall to its successors in interest. Pipe maintenance will constitute future land-disturbing activity that has been guaranteed by the issuance of the permit before us.
The dissent next focuses on the benefits of piping during heavy rains, as those portions of the trout waters enclosed within the piping will not suffer erosion (assuming no cracks or other problems with the piping). The point of our analysis is focused on the terminal end of the piping, and that portion of the trout waters into which the piped water will be deposited, not the banks of the trout waters that no longer exist because of the piping. Our holding does not mean that "a stream could never be piped because the possible risk of increased water velocity might cause erosion." It does mean that the massive piping conducted in the case before us for the construction of a golf course violates the mandate of N.C. Gen.Stat. § 113A-57(1). It would defeat the purpose of N.C. Gen.Stat. § 113A-57(1) to assume the General Assembly *583 intended for the "on, over or under" exemption to allow unfettered development over North Carolina's trout waters so long as those waters are piped. Utilization of the "on, over or under" exemption to N.C. Gen. Stat. § 113A-57(1) for the piping necessary to construct a roadway over a trout water, for example, would be more consistent with the stated purpose of the Act.
Contrary to the dissent's assertion, the express intent of the General Assembly as set forth in N.C. Gen.Stat. § 113A-51 is not to allow the protections it specifically enacted for trout waters to be as easily circumvented as they were in the case before us. The intent of the General Assembly as stated in N.C. Gen.Stat. § 113A-51 is much different than the single line from the five sentence preamble to which the dissent refers. When one reads N.C. Gen.Stat. § 113A-51 in its entirety, it is clear that the intent of the General Assembly was protection of our waters from the effects of sedimentation caused by unchecked development. The sentence the dissent quotes from the preamble[4] merely states the reasonable desire of the General Assembly to allow development along our waters so long as that development complies with the restrictions enacted to protect those waters.
We hold that the plain language of N.C. Gen.Stat. § 113A-57(1) prohibits the kind of land-disturbing activity conducted by Mountain Air. The trial court erred in determining Mountain Air's activities conformed with the provisions of N.C. Gen.Stat. § 113A-57(1), and in entering summary judgment in favor of Respondents.

III.
Assuming arguendo that the language of N.C. Gen.Stat. § 113A-57(1) is in some manner ambiguous, we hold that Mountain Air's activities still violate the mandate of N.C. Gen.Stat. § 113A-57 (1). As stated supra, "the Sedimentation Control Commission may approve plans which include land-disturbing activity along trout waters when the duration of said disturbance would be temporary and the extent of said disturbance would be minimal." N.C. Gen.Stat. § 113A-57(1).
When the plain language of a statute proves unrevealing, a court may look to other indicia of legislative will, including: "the purposes appearing from the statute taken as a whole, the phraseology, the words ordinary or technical, the law as it prevailed before the statute, the mischief to be remedied, the remedy, the end to be accomplished, statutes in pari materia, the preamble, the title, and other like means[.]" The intent of the General Assembly may also be gleaned from legislative history. Likewise, "later statutory amendments provide useful evidence of the legislative intent guiding the prior version of the statute." Statutory provisions must be read in context: "Parts of the same statute dealing with the same subject matter must be considered and interpreted as a whole." "Statutes dealing with the same subject matter must be construed in pari materia, as together constituting one law, and harmonized to give effect to each."
Jefferson-Pilot, 161 N.C.App. at 560, 589 S.E.2d at 181. "[T]he reviewing court must construe the statute in an attempt not to `defeat or impair the object of the statute ... if that can reasonably be done without doing violence to the legislative language.'" Carolina Power & Light, 358 N.C. at 518, 597 S.E.2d at 722. We hold that Respondents' interpretation of N.C. Gen.Stat. § 113A-57(1) cannot be adopted without defeating or impairing "the object of the statute," and "without doing violence to the legislative language [of that statute]."
Petitioners and Respondents take opposing views on the legislative intent behind N.C. Gen.Stat. § 113A-57(1). Petitioners argue that N.C. Gen.Stat. § 113A-57(1) *584 is intended to regulate "land-disturbing activities," relying on the language of the statute. Respondents argue that N.C. Gen.Stat. § 113A-57(1) is intended to regulate "sedimentation," relying on the title of Article 4 of Chapter 113A of the North Carolina General Statutes, in which N.C. Gen.Stat. § 113A-57(1) is found. Article 4 is entitled: "Pollution Control and Environment Sedimentation Pollution Control Act of 1973[.]" While the titles of statutes and acts may be consulted in order to assist in determining legislative intent when the language of the statute is ambiguous, Jefferson-Pilot, 161 N.C.App. at 560, 589 S.E.2d at 181, titles are not given the deference in interpretation that we give the actual language of the statute itself. Wiggs v. Edgecombe County, 361 N.C. at 322, 643 S.E.2d at 907; Carolina Power & Light, 358 N.C. at 518, 597 S.E.2d at 722.
The trial court concluded in its order, and Respondents argue in their brief: "The expressly stated intent of the General Assembly in the Sedimentation Act is to `permit development of this State to continue with the least detrimental effects from pollution by sedimentation.'" N.C. Gen.Stat. § 113A-51. This direct quote from N.C. Gen.Stat. § 113A-51 represents a small portion of the preamble of the Act, and could give the false impression that the main focus of the Act is the promotion of development in North Carolina.
The preamble of the Act states in relevant part:
The sedimentation of streams, lakes and other waters of this State constitutes a major pollution problem. Sedimentation occurs from the erosion or depositing of soil and other materials into the waters, principally from construction sites and road maintenance. The continued development of this State will result in an intensification of pollution through sedimentation unless timely and appropriate action is taken. Control of erosion and sedimentation is deemed vital to the public interest and necessary to the public health and welfare, and expenditures of funds for erosion and sedimentation control programs shall be deemed for a public purpose. It is the purpose of this Article to provide for the creation, administration, and enforcement of a program and for the adoption of minimal mandatory standards which will permit development of this State to continue with the least detrimental effects from pollution by sedimentation.
N.C. Gen.Stat. § 113A-51 (2007) (emphasis added). Though it is clear the General Assembly intended to balance the benefits of development against the negative impact development has on the environment of North Carolina, the preamble makes clear that the General Assembly views unregulated development around the fresh waters of North Carolina as an environmental hazard, and that the Act was enacted to control and reduce sediment in the fresh waters of North Carolina through the regulation of development near those waters. This is a pollution control act, not a development promotion act, as Respondents seem to contend. This Court has stated that the "legislative intent behind the enactment of the SPCA ... is to protect against the sedimentation of our waterways. See N.C. Gen.Stat. § 113A-51." McHugh v. North Carolina Dep't of Envtl., Health & Natural Resources, 126 N.C.App. at 476, 485 S.E.2d at 866. Our Court in McHugh also stated "G.S. 113A-57(1) deals with land-disturbing activity near a lake or natural watercourse." Id. at 475, 485 S.E.2d at 865. The logical conclusion, supported by the language of the Act in general, and N.C. Gen.Stat. § 113A-57(1) in particular, is that the General Assembly intended, through N.C. Gen.Stat. § 113A-57(1), to control sedimentation through the regulation of land-disturbing activities. N.C. Gen.Stat. § 113A-57(1) is, therefore, specifically a land-disturbing activity regulation statute, aimed at controlling or preventing the flow of sediment into the fresh waters of North Carolina.
Further, the Commission is a division of the Land Quality Section of the Division of Land Resources, and shares offices with the Land Quality Section of the Division of Land Resources. 15A N.C.A.C. 4A.0101. Though the object of the Act is prevention or reduction of sediment reaching the fresh waters of North Carolina, this object is achieved through the regulation of land-based activities, *585 which is conducted by agencies responsible for land-use regulation.
Respondents further argue that "North Carolina courts have consistently determined that the purpose of the Sedimentation Act is the control of sedimentation caused by development and construction activities, not the control of development and construction activities themselves." A review of the appellate opinions of North Carolina does not support Respondents' sweeping assertion. Respondents primarily rely on our Court's opinion in State ex rel. Lee v. Penland-Bailey Co., 50 N.C.App. 498, 274 S.E.2d 348 (1981). Respondents argue that Penland-Bailey stands for the proposition that the sole purpose of the Act is to control sedimentation and erosion, not land-disturbing activities. However, our Court in Penland-Bailey stated: "The legislative history of the act is consistent with the conclusion that it was for the purpose of controlling erosion and sedimentation, rather than only land-disturbing activities." Id. at 501-02, 274 S.E.2d at 351 (emphasis added). In Cox v. State, 81 N.C.App. 612, 344 S.E.2d 808 (1986), our Court decided whether the Act applied to land-disturbing activity that pre-dated the effective date of the Act. Our Court stated: "To accomplish the purpose of the Act, the Act and the regulations enacted pursuant to it may be applied to land-disturbing activities which occurred before the Act and regulations became effective." Id. at 615, 344 S.E.2d at 810. This is another clear statement from our Court that the Act regulates land-disturbing activities to control sediment and prevent it from entering the fresh waters of North Carolina. None of the other opinions cited by Respondents conflict with our holding that though the Act was passed for the purpose of controlling sedimentation and erosion, the purpose of N.C. Gen.Stat. § 113A-57(1) is to achieve these goals through the means of regulating development and land-disturbing activities along North Carolina's fresh waters.
Further, it is clear that the Act is, at its core, an environmental pollution control act. It is contained within Chapter 113A, which is titled: "Pollution Control and Environment." N.C. Gen.Stat. § 113A-57(1) is intended to control land-disturbing activities during development in order to prevent sediment from such activities from polluting the fresh waters of North Carolina. The stated and logical purpose of preventing the pollution of these waters is to provide healthy, safe environments, in as pristine a state as is practicable, for recreational uses, and plant and animal preservation. 15A N.C.A.C. 2B.0101(c)(1). The General Assembly decided that the protection of trout waters required specific, more stringent legislation, and included such legislation in N.C. Gen. Stat. § 113A-57(1); see also 15A N.C.A.C. 2B.0101 (e)(1). The session law promulgating the trout waters buffer zone requirement is titled in relevant part: "An Act to Authorize [the Commission] ... to Provide for a Setback for Land-Disturbing Activity Occurring Near Certain [i.e. certified] Trout Waters[.]" 1989 N.C. Sess. Laws, ch. 676, § 3. This title provides further evidence that the intent of the General Assembly in enacting the trout waters provision in N.C. Gen.Stat. § 113A57(1) was to regulate land-disturbing activities, and to do so through the imposition of a mandatory, undisturbed "setback" or buffer zone.
Though the means utilized by N.C. Gen. Stat. § 113A-57(1) is control of land-disturbing activities to prevent sediment from entering trout waters, the clear intent of the General Assembly in including the trout water provision was the protection of trout and trout habitat in North Carolina, a fact recognized by the Commission through promulgating relevant regulations in the administrative code. See 15A N.C.A.C. 2B.0101(e)(1) ("freshwaters protected for natural trout propagation and survival of stocked trout"); see also 15A N.C.A.C. 2B.0101(c)(1) (which encompasses trout waters and provides for the preservation of all fresh waters "for secondary recreation, fishing, aquatic life including propagation and survival, and wildlife").
If we were to adopt Respondents' interpretation of N.C. Gen.Stat. § 113A-57(1), the Commission could allow variances for development along and over all the trout waters of North Carolina so long as the trout waters were diverted through piping. This would eviscerate the mandate that: "Waters that *586 have been classified as trout waters by the Environmental Management Commission shall have an undisturbed buffer zone 25 feet wide or of sufficient width to confine visible siltation within the twenty-five percent (25%) of the buffer zone nearest the land-disturbing activity, whichever is greater." (Emphasis added). This interpretation, though it might prevent sedimentation, would allow for the destruction of North Carolina's trout habitat. This the General Assembly could not have intended. Contrary to the assertion of the dissent, however, our holding does not "eliminate the variance provisions[,]" as the variance provisions survive our holding alive and well for the purposes for which they were enacted. These purposes clearly were not to render the protections of N.C. Gen.Stat. § 113A-57(1) virtually toothless, but to allow for reasonable "temporary and minimal" land-disturbing activity within the trout waters buffer zone when necessary for permanent construction activities conducted outside the trout waters buffer zone.
We hold that the language of N.C. Gen.Stat. § 113A-57(1) means what it clearly states: the mandated buffer zone for trout waters "shall" remain undisturbed, subject only to the exception that disturbance within that buffer zone may be conducted, with the proper issuance of a variance, so long as the "disturbance" within the buffer zone is both temporary and minimal, or the activity constitutes "a land-disturbing activity in connection with the construction of facilities to be located on, over, or under a lake or natural watercourse." To allow development within the mandatory undisturbed twenty-five foot buffer zone established by N.C. Gen.Stat. § 113A-57(1) for trout waters would be to render the following language inoperative: "Waters that have been classified as trout waters ... shall have an undisturbed buffer zone 25 feet wide [or wider]." We must construe the language of a statute, if possible, to give meaning to every word and provision, and not do "violence to the legislative language." Carolina Power & Light, 358 N.C. at 518, 597 S.E.2d at 722; see also Wilkins v. N.C. State Univ., 178 N.C.App. 377, 379, 631 S.E.2d 221, 223 (2006) (citation omitted).
Finally, when we construe the general provisions of N.C. Gen.Stat. § 113A-57(1) in pari materia with the more stringent provisions regarding trout waters, Respondents' interpretation of the statute defeats the clear purpose of the General Assembly to provide enhanced protections for trout waters by creating a mandatory buffer of at least twenty-five feet. Respondents agree that the "temporary and minimal" language in N.C. Gen. Stat. § 113A-57(1) evinces the intent of the General Assembly to provide more protection for trout waters. However, Respondents' argument, if adopted, would lead to the incongruous outcome of allowing permanent development within buffer zones protecting trout waters when permanent development within the buffer zones of fresh non-trout waters is prohibited. This cannot be what the General Assembly intended.
N.C. Gen.Stat. § 113A-57(1) allows land-disturbing activities near fresh non-trout waters to occur as close to those fresh waters as may be achieved so long as visible sediment will be contained "within the twenty-five percent (25%) of the buffer zone nearest the land-disturbing activity." This means that for fresh non-trout waters, it is possible that land-disturbing activities and permanent development may be permitted closer than twenty-five feet to fresh non-trout waters so long as they do not violate the "twenty-five percent" mandate. N.C. Gen.Stat. § 113A-57(1) includes no provision allowing permanent development within the seventy-five percent of the buffer zone that must remain sediment free protecting fresh non-trout waters, even if said land-disturbing activities would be temporary and minimal. We cannot hold that the General Assembly intended the "temporary and minimal" exception contained within the more stringent trout waters provision to allow development that obliterates the trout waters buffer zone entirely, when under the less stringent fresh non-trout waters provision, this type of development is prohibited. Carolina Power & Light, 358 N.C. at 518, 597 S.E.2d at 722; Jefferson-Pilot, 161 N.C.App. at 560, 589 S.E.2d at 181. While we agree that the "temporary and minimal" exception in the trout waters provision was included "to provide *587 relief from the more stringent requirements [of the trout waters provision] in limited situations[,]" we cannot agree with the dissent that this "limited situations" exception was intended by the General Assembly to allow development along or over trout waters that would be prohibited along or over less restricted waters. Contrary to the argument made by the dissent, our holding sets no precedent concerning what development might be allowed "in" a trout stream pursuant to the "on, over, or under" exemption. Further, development is clearly allowed "around" trout waters, pursuant, of course, to the restrictions mandated by N.C. Gen.Stat. § 113A-57(1). N.C. Gen.Stat. § 113A-57(1) restricts development in certain ways and in certain areas; it does not prohibit development. It seeks a balance between development and preserving our waters, but as is made clear in the preamble, N.C. Gen.Stat. § 113A-51, the General Assembly chose to increase restrictions on development in order to protect North Carolina's fresh waters.
Regulation of land-disturbing activities to prevent sedimentation of trout waters is merely a means to protect trout populations and habitat. Therefore, when the Commission, an ALJ, a superior court, or an appellate court of North Carolina reviews actions that implicate the trout waters provision of N.C. Gen.Stat. § 113A-57(1), the ultimate intent of the General Assembly  protection of trout populations and habitat  must be a primary objective and concern in reaching any final resolution concerning granting of a variance allowing temporary and minimal land-disturbing activities within a trout waters buffer zone.
We hold that the ultimate intent of the General Assembly in enacting the trout waters provisions within N.C. Gen.Stat. § 113A-57(1) was the protection of trout populations and habitat, through sedimentation control, by means of stricter regulation of land-disturbing activities near trout waters. N.C. Gen.Stat. § 113A-57(1) prohibits, even with approval from the Commission, land-disturbing activities within the mandated buffer zone  whether it be twenty-five feet or greater  that is not both temporary and minimal.[5] The acts of Mountain Air within the trout water buffer zone were not minimal, and will not be temporary. Further, even assuming arguendo that Mountain Air's actions could somehow be interpreted as temporary and minimal land-disturbing activities, enclosing a trout water within nearly 2,000 feet of pipe cannot comply with the ultimate legislative intent of the trout water provision included in N.C. Gen.Stat. § 113A-57(1), the protection of trout populations and habitat. See 15A N.C.A.C. 2B.0101(e)(1).
We reverse the order of the trial court, and remand to the trial court with instruction to enter summary judgment in favor of Petitioners on this issue. In light of our holdings in this opinion, we do not address Petitioners' additional arguments.
Reversed and remanded.
Judge BEASLEY concurs.
Judge STEELMAN dissents with a separate opinion.
STEELMAN, Judge dissenting.
I must respectfully dissent from the majority's decision to reverse the trial court's order granting respondent's motion for summary judgment. The fundamental purpose of N.C. Gen.Stat. § 113A-57(1) is to control the effects of sedimentation resulting from land-disturbing activities. Based upon a proper application of this principal, respondent issued a variance to Mountain Air, and the trial court properly affirmed respondent.

I. Additional Factual and Procedural Background
Before undertaking this project, Mountain Air obtained a Clean Water Act § 401 Water Quality Certification from the North Carolina Department of Environment and Natural Resources Water Quality Division. It also obtained *588 a § 404 Wetlands Permit from the United States Army Corps of Engineers. Finally, it obtained approval of an erosion control plan pursuant to Article 4 of Chapter 113A of the General Statutes. The variance obtained from the Division of Land Resources (respondent) pursuant to N.C. Gen. Stat. § 113A57(1) and 15A N.C.A.C. 4B.0125(c) contained fifteen separate conditions to which Mountain Air was required to adhere. The permit was described by Francis M. Nevils, Jr. (Nevils), Section Chief, Land Quality Section of the Division of Land Resources, as being "particularly stringent." The original permit prohibited work instream and within trout buffer zones "during the trout spawning season from October 15 through April 15." This latter condition was modified to prohibit work from January 15 through April 15. The reason for this modification was that there were no trout in Banks Creek where the proposed project was to be located, and only rainbow trout were present downstream from the proposed construction. The original permit restricted activity based upon the spawning season for brown trout, which were determined not to be downstream. The modification restricted instream work during the spawning season for rainbow trout.
On 12 November 2003, petitioners filed a petition for a contested case hearing challenging the issuance of a variance by respondent to Mountain Air, alleging six specific defects in the permit. On 12 January 2006, Administrative Law Judge James L. Conner, II granted summary judgment to petitioners based upon the holding that the activities of Mountain Air were neither temporary nor minimal. On 19 January 2007, respondent entered its final agency decision, rejecting the decision of Administrative Law Judge Conner. The Commission held that "[t]he Sedimentation Act does not prohibit all development around trout waters, as the Petitioners and ALJ Conner conclude. Instead, the Sedimentation Act regulates the effects of sedimentation on such waters, and imposes requirements to ensure that those sedimentation effects are temporary and minimal."
Petitioners appealed from the final agency decision, taking two specific exceptions: (1) the ruling that "G.S. 113A-57(1) did not prevent activities `on, over, or under' the trout stream[;]" and (2) the ruling that "the impacts of the activities in the trout buffer were temporary and minimal." The trial court held that petitioners abandoned their first exception based upon the last sentence of N.C. Gen.Stat. § 113A-57(1). It further held that the buffer requirements of N.C. Gen. Stat. § 113A-57(1) only apply to land-disturbing activities during periods of construction or improvement to land and upheld respondent's final agency decision. The trial court found that respondent did not hear new evidence, nor did the trial court consider new evidence.
On appeal to this Court, petitioners assert twenty-nine assignments of error challenging the trial court's entry of summary judgment in favor of respondent. Unchallenged was the trial court's second conclusion of law that petitioners had abandoned their exception concerning the last sentence of N.C. Gen. Stat. § 113A-57(1).

II. Standard of Review
Since respondent did not adopt the decision of the administrative law judge, the trial court applied a de novo standard of review. N.C. Gen.Stat. § 150B-51(c) (2007). Since both the administrative law judge and the final agency decision resolved the case on summary judgment, the trial court was permitted to enter an order resolving the case under Rule 56 of the Rules of Civil Procedure pursuant to N.C. Gen.Stat. § 150B-51(d) (2007).
The order of the trial court recites that the only issue decided was: "[w]hether the Commission improperly ruled that, based upon the stipulated facts in the contested case, the impacts of the project at issue in this matter were temporary and minimal under North Carolina's Sedimentation Pollution Control Act. ..." The order is structured with findings of fact and conclusions of law. However, the findings merely refer to the stipulations of the parties, the lack of evidence in the record, and that a variance with particularly stringent terms was issued. I would hold that these are not findings of fact in any traditional sense, Quick v. Quick, 305 N.C. 446, 451, 290 S.E.2d 653, 657 (1982), that the *589 manifest intent of the trial court's order was that there were no material issues of fact, and that respondent and Mountain Air were entitled to judgment as a matter of law. I would review this order as a summary judgment order, under a de novo standard of review. I therefore do not agree with the portions of the majority opinion referring to "findings of fact" and analyzing whether they were supported by competent evidence in the record.

III. Statutory Purpose
At the heart of this case is the construction of the provisions of Article 4 of Chapter 113A of the General Statutes (Sedimentation Pollution Control Act of 1973). The preamble of this article clearly identifies the problem it intends to remedy: "[t]he sedimentation of streams, lakes and other waters of this State. ..." N.C. Gen.Stat. § 113A-51 (2007). The mechanism employed to control sedimentation is the regulation of "land-disturbing activity." This is defined in N.C. Gen. Stat. § 113A52(6) (2007) as "any use of the land by any person in residential, industrial, educational, institutional or commercial development, highway and road construction and maintenance that results in a change in the natural cover or topography and that may cause or contribute to sedimentation."
The purpose of this statute is to control sedimentation and to "permit development of this State to continue with the least detrimental effects from pollution by sedimentation." N.C. Gen.Stat. § 113A-51 (emphasis added). Its purpose was not to limit or restrict development. See McHugh v. N.C. Dept. Of E.H.N.R., 126 N.C.App. 469, 476, 485 S.E.2d 861, 866 (1997) ("[T] he stated legislative intent behind the enactment of the [Sedimentation Pollution Control Act] ... is to protect against the sedimentation of our waterways." (citing N.C. Gen.Stat. § 113A51)); Cox v. State ex rel. Summers, 81 N.C.App. 612, 615, 344 S.E.2d 808, 810 ("The purpose of the Act, G.S. 113A-50, et seq., is to control erosion and sedimentation, rather than only land-disturbing activities." (citation omitted)), disc. review denied, 318 N.C. 413, 349 S.E.2d 592 (1986).
The particular portion of Article 4 at issue is N.C. Gen.Stat. § 113A-57(1), which in its entirety reads as follows:
No land-disturbing activity subject to this Article shall be undertaken except in accordance with the following mandatory requirements:
(1) No land-disturbing activity during periods of construction or improvement to land shall be permitted in proximity to a lake or natural watercourse unless a buffer zone is provided along the margin of the watercourse of sufficient width to confine visible siltation within the twenty-five percent (25%) of the buffer zone nearest the land-disturbing activity. Waters that have been classified as trout waters by the Environmental Management Commission shall have an undisturbed buffer zone 25 feet wide or of sufficient width to confine visible siltation within the twenty-five percent (25%) of the buffer zone nearest the land-disturbing activity, whichever is greater. Provided, however, that the Sedimentation Control Commission may approve plans which include land-disturbing activity along trout waters when the duration of said disturbance would be temporary and the extent of said disturbance would be minimal. This subdivision shall not apply to a land-disturbing activity in connection with the construction of facilities to be located on, over, or under a lake or natural watercourse.
N.C. Gen.Stat. § 113A-57(1) (2007).
The majority's construction of the provisions of Article 4 of Chapter 113A of the General Statutes and the regulations promulgated thereunder is based upon several flawed assumptions.

IV. No Development Concept
The first assumption made by the majority is that Chapter 113A requires that trout streams and trout buffer zones be maintained in a natural, pristine state in perpetuity. The majority ignores the express purpose of the Act: "It is the purpose of this Article to provide for the creation, administration, and enforcement of a program and for the adoption of minimal mandatory standards which will permit development of this State to continue with the least detrimental effects from *590 pollution by sedimentation." N.C. Gen.Stat. § 113A-51 (emphasis added).
There is no authority in the General Statutes, or in the regulations for the majority's construction of these provisions, which if adopted would prohibit development in or around a trout stream. If such was the intent of the General Assembly, they certainly would have clearly so stated, and would not have chosen as the vehicle for accomplishing this goal a sedimentation control statute. Rather, the clear intent and purpose of N.C. Gen.Stat. § 113A-57(1) is to control sedimentation pollution in the waters of this State, and particularly in trout streams.
Further, the issue of whether N.C. Gen. Stat. § 113A-57(1) prevented activities "on, over, or under" a trout stream was abandoned by petitioners before the trial court. This ruling by the trial court was not assigned as error to this Court, and is thus not before this Court. N.C.R.App. P. 10(a) ("[T]he scope of review on appeal is confined to a consideration of those assignments of error set out in the record on appeal. ..."); Atlantic Coast Mech., Inc. v. Arcadis, Geraghty & Miller of N.C., Inc., 175 N.C.App. 339, 346, 623 S.E.2d 334, 340 (2006) (holding that because plaintiff failed to assign error to the dismissal of one its claims, that issue was not properly before this Court).
The second assumption made by the majority is that in determining whether land-disturbing activities along a trout buffer zone are temporary and minimal, we must look to the scope of the entire project and not the sedimentation effects of the project. This was the critical area of dispute between Administrative Law Judge Conner and the Commission. The fundamental purpose of the Sedimentation Pollution Control Act of 1973 was to restrict the effects of sedimentation, not to restrict any type of development of real estate. In determining whether land-disturbing activities are temporary and minimal, the only standard relevant under Chapter 113A are the sedimentation effects.
The majority freely acknowledges that it is using a sedimentation control statute to require the maintenance of trout streams and trout stream buffers inviolate in perpetuity. No matter how laudable this goal may be, such a decision is reserved for the General Assembly, and not for the courts of this State.
Third, the majority appears to have difficulty reconciling the more stringent protection for trout waters and the variance provisions. These provisions were added by the General Assembly in 1989 N.C. Sess. Laws ch. 676, § 3. Since the variance provisions were enacted at the same time as the increased protection for trout waters, and are limited to trout waters, it is clear that the General Assembly decided that a mechanism was needed to provide relief from the more stringent requirements in limited situations. Such provisions in statutes are not uncommon or irreconcilable.

V. "Minimal" and "Temporary" Disturbance
The fundamental issue in this appeal is whether the trial court correctly concluded that respondent properly issued the variance to Mountain Air and ensured that any sedimentation that occurred during the construction of this golf course was "minimal" and "temporary" as required by N.C. Gen.Stat. § 113A-57(1).

A. Minimal Disturbance
The majority holds that Mountain Air's actions of clearing all vegetation in approximately 160 feet of the buffer zone; removing trees and tree canopy along 2,763 feet of Banks Creek; and installing and re-routing the stream through underground piping do not constitute "minimal" land-disturbing activities. The majority cites the fact that the totality of the land-disturbing activity impacted twenty-two percent of the trout buffer zone, which violated 15A N.C.A.C. 4B.0125(c) and that there is nothing in the record to show Mountain Air received written approval to exceed those limits.[6]
*591 The majority erroneously focuses on the entire scope of the construction project and the ultimate condition of the trout buffer zone after construction is completed rather than the sedimentation effects of these activities during construction. The variance issued by respondent stated: "In accordance with N.C. Gen.Stat. § 113A-57(1) and N.C. Admin. Code 15A 4B.0125(c), this letter will serve as written approval of the proposed encroachment into the trout water buffer zones, of tributaries to Banks Creek, as shown in the submittal dated August 6, 2003." The 6 August 2003 proposal included: a tree removal and tree canopy maintenance plan; drop inlet detail; pipe installation sequence; revised pipe sizes and velocity calculations; junction box replacement of plunge pool between holes 7 and 8; and plunge pool detail and related information. Respondent approved Mountain Air's 6 August 2003 proposal, but made it contingent on fifteen "particularly stringent" conditions. Further, the administrative record contains a map of the "Banks Creek Nine Holes Buffer Variance Plan" which refers to the exact percentage of the trout stream that would be affected by the vegetative clearing, tree removal, and underground piping. Nevils testified in his deposition that he considered and approved Mountain Air's plan, which showed the "cutting of some trees," grading, and placement of the pipes in the trout buffer zone. Based upon this evidence, respondent was aware of the exact dimensions of the construction that would occur at Banks Creek. The variance issued by respondent constituted "written approval of the Director" to exceed the limitations of 15A N.C.A.C. 4B.0125(c).
Further, a review of Mountain Air's 6 August 2003 variance proposal and the conditions contained in the variance issued ensured the sedimentation effects during the construction of the golf course were minimal. Mountain Air's tree removal plan included the following provisions: before removal commenced, individual trees to be removed would be flagged and respondent's representatives would be given an opportunity to inspect the flagged areas; trees would be cut above the ground leaving stumps and root mass intact; trees would be tied off and lifted directly out of the buffer where feasible or felled uphill and away from the stream bank; and sub-canopy vegetation would only be removed by hand. Likewise, Mountain Air's stormwater drainage installation plan detailed their efforts to "reduce the already minimal risk of sedimentation[.]" Mountain Air proposed to create "work teams" that would be tasked with specific work responsibilities and would be under supervision by a manager who had been certified under the state-sanctioned Clean Water Contractor program. Mountain Air also identified theorder and methods to be used for each specific segment of pipe installation. The Sediment Control Crew would maintain stormwater and sediment pollution control logs. Mountain Air would also monitor the 10-day weather forecast on a daily basis and delay or stop any activity if significant rain was forecast for the following twenty-four hour period.
In addition, respondent conditioned the variance's approval on various "stringent" sedimentation pollution controls. Mountain Air had to monitor the weather forecast three days in advance of any land-disturbing activity, and the activity could not begin if within twenty-four hours there was a fifty percent chance of precipitation. All disturbed areas in the buffer zone had to be stabilized with an adequate temporary ground cover at the end of each workday. All materials excavated during any work within the buffer zone had to be deposited twenty-five feet from the top of the stream bank. A person qualified in erosion and sedimentation control was required to be present during all land-disturbing activities within the buffer zone. Tree removal could not begin until the site had been stabilized *592 and could only be accomplished with equipment that minimized disturbance to the area. The approved erosion and sedimentation control plan for the golf course construction was required to have "adequately sized measures" and to include "the use of skimmer basins, skimmer traps or flocculant(s) and level spreaders or other means to create dispersed flow where appropriate to reduce sedimentation and turbidity." Mountain Air was also prohibited from working in the buffer zone during the rainbow trout spawning season as an additional measure to protect their habitat.
Both Mountain Air's variance proposal and respondent's "particularly stringent" conditions of the variance ensured that erosion and sedimentation pollution was "minimal" during the period of construction along Banks Creek.

B. Temporary Disturbance
The majority also holds that Mountain Air's land disturbing activities are not temporary because "evidence in the record shows that Mountain Air will continue to conduct activity in the trout waters buffer zone after completion of all construction." The majority focuses on the fact that Mountain Air will have to periodically remove trees and tree canopy, and maintenance and repair the piping in order to preserve the functionality of the golf course.
We note that the requirements of N.C. Gen.Stat. § 113A-57(1) only apply to land-disturbing activities[7] during periods of construction and not to activities which occur once construction has been completed. See N.C. Gen.Stat. § 113A-57(1) (providing that "No land-disturbing activity during periods of construction or improvement to land shall be permitted in proximity to a lake or natural watercourse unless a buffer zone is provided along the margin of the watercourse. ..." (emphasis added)); N.C. Gen.Stat. § 113A-51 ("Sedimentation occurs from the erosion or depositing of soil and other materials into the waters, principally from construction sites and road maintenance.").
Even assuming arguendo that the requirements of N.C. Gen.Stat. § 113A-57(1) extend beyond the completion of the construction project, no activity Mountain Air may have to conduct could be considered "land-disturbing." Mountain Air's "Tree Canopy Maintenance Plan" contained the following provisions: all trees to be removed would be flagged in the field; all trees would be cut using hand tools; all trees greater than 3" in diameter at breast height will be cut and left in the buffer area; trees equal or less than 3" at breast height will be removed from the buffer by hand; all trees will be cut above the ground, leaving stumps and root mass intact; and subcanopy improvement will be done using hand tools. The conditions in the variance regarding tree removal would also still be applicable to Mountain Air's conduct.
The majority holds as a matter of law "that this ongoing activity `may cause or contribute to sedimentation[,]'" citing the last clause in the definition of "land-disturbing activity" as found in N.C. Gen.Stat. § 113A-52(6). However, there is no evidence in the record to support this assertion. When the majority asserts that the removal of the tree canopy and the removal of the trees may lead to more rain reaching the ground causing sedimentation pollution to enter the trout stream, it is engaging in fact-finding. It is not the role of the appellate courts to engage in fact-finding. See Godfrey v. Zoning Bd. of Adjustment, 317 N.C. 51, 63, 344 S.E.2d 272, 279 (1986) ("Fact finding is not a function of our appellate courts.").
While a "land-disturbing activity" includes "a change in the natural cover or topography," it must also be one that "may cause or contribute to sedimentation." N.C. Gen.Stat. § 113A-52(6). When a wooded area is cleared, stumps are removed, and machinery is used to remove trees, clearly sedimentation may occur. However, when no stumps are removed, the trees over 3" in diameter *593 are not removed, and all cutting is to be done with hand tools, I cannot fathom how this could cause or contribute to sedimentation. The tightly regulated maintenance procedures do not constitute "land-disturbing activities." Further, the majority engages in rank speculation concerning the possibility of the removal and replacement of damaged piping. This speculation is beyond the scope of the permit before this Court. Clearly, if such activity was to take place in the future, and it involved a "land-disturbing activity" as defined in N.C. Gen.Stat. § 113A-52(6), then the provisions of N.C. Gen.Stat. § 113A-57 would have to be complied with. Such issues are for another court on another day.
The majority makes an alternative assertion that there is a possibility that heavy rains resulting in flooding would increase the water velocity in the piped portion of the creek, which in turn presents the possibility of heightened erosion and sedimentation downstream. However, the majority ignores the obvious result of the piping, that there would be no erosion in the piped area during times of flooding. Under the majority's theory, a stream could never be piped because the possible risk of increased water velocity might cause erosion. Such a holding would have devastating results for development in North Carolina, and is contrary to the express intent of the General Assembly as set forth in N.C. Gen.Stat. § 113A-51.
The issuance of the variance does not violate the requirements of N.C. Gen.Stat. § 113A-57(1) that the effects of any land-disturbing activity in the trout buffer zone be temporary.

VI. Statutory Construction

A. Development in Trout Waters
In conclusion, the majority purports to construe the provisions of Article 4 in para materia to reach the conclusion that the variance provisions of N.C. Gen.Stat. § 113A-57(1) cannot "allow development that obliterates the trout waters buffer zone entirely, when under the less stringent fresh non-trout waters provision, this type of development is prohibited." I disagree with this analysis for several reasons.
First, it ignores completely the last sentence of N.C. Gen.Stat. § 113A-57(1), which specifically permits "land-disturbing activity in connection with the construction of facilities to be located on, over, or under a lake or natural watercourse." N.C. Gen.Stat. § 113A-57(1). This provision applies both to trout and non-trout waters and was in the statute prior to the 1989 amendments. The construction of a golf-course "over" the stream falls within this specific exception.
Second, with a stroke of a pen, the majority purports to eliminate the variance provisions, which were enacted at the same time as the more stringent trout buffer requirements.
Finally, as noted above, the purpose of Article 4 of Chapter 113A is not to prohibit development, but rather to regulate the effects of land-disturbing activity which leads to sedimentation in the waters of North Carolina.

B. Deference to Agency Interpretation
It must be noted that respondent's interpretation of the purpose and meaning of N.C. Gen.Stat. § 113A-57(1) should traditionally be given some deference by the courts in light of the fact that respondent was the agency chosen to administer this statute. See County of Durham v. N.C. Dep't of Env't & Natural Resources, 131 N.C.App. 395, 396, 507 S.E.2d 310, 311 (1998) ("[E]ven when reviewing a case de novo, courts recognize the long-standing tradition of according deference to the agency's interpretation" of a statute it administers. (citations omitted)), disc. review denied, 350 N.C. 92, 528 S.E.2d 361 (1999). This proposition is still legally sound despite the General Assembly's addition of N.C. Gen.Stat. § 150B-51(c) to the North Carolina Administrative Procedure Act in 2000, which provides that "in a contested case in which an administrative law judge made a decision, in accordance with G.S. 150B-34(a), and the agency does not adopt the administrative law judge's decision, the court shall review the official record, de novo, and ... shall not give deference to any prior decision made in the case. ..." N.C. Gen.Stat. § 150B-51(c); Rainey v. N.C. Dep't of Pub. Instruction, 361 N.C. 679, 652 S.E.2d 251 (2007). In Rainey, our Supreme *594 Court interpreted N.C. Gen.Stat. § 150B-51(c) and held that the subsection "refers only to the agency's decision in the specific case before the court" and that the trial court is not barred from "considering the agency's expertise and previous interpretations of the statutes it administers, as demonstrated in rules and regulations adopted by the agency or previous decisions outside of the pending case." Id. at 681, 652 S.E.2d at 252. The rationale behind its holding was as follows:
If the only authority for the agency's interpretation of the law is the decision in that case, that interpretation may be viewed skeptically on judicial review. If the agency can show that the agency has consistently applied that interpretation of the law, if the agency's interpretation of the law is not simply a "because I said so" response to the contested case, then the agency's interpretation should be accorded the same deference to which the agency's construction of the law was entitled under prior law.
Id. at 681-82, 652 S.E.2d at 252-53 (quotation omitted). It is clear from the record that respondent has repeatedly determined that based upon the purpose of the Act found in the preamble to N.C. Gen.Stat. § 113A-50 et seq., and its express grant of authority to "approve plans which include land-disturbing activity along trout waters when the duration of said disturbance would be temporary and the extent of said disturbance would be minimal[,]" that it is authorized to grant variances when the impact from sedimentation would be temporary and minimal.[8] Because respondent can show that the agency has consistently applied this interpretation of the law, and because its interpretation is not simply a "because I said so" response, respondent should be afforded deference. However, the trial court, applying a de novo standard of review and without giving any deference to the final agency decision, interpreted the language of the Act in the same manner as respondent.
I would hold that because the sedimentation effects of Mountain Air's construction project were temporary and minimal, respondent properly issued the variance to Mountain Air. The trial court did not err by granting summary judgment in favor of respondent. I would affirm the trial court's order.
NOTES
[1] Respondents agree with this determination, stating in their brief "the evidence in the record shows that there is only a potential to `cause or contribute to sedimentation' during Mountain Air's construction activities." (Emphasis added). We do not find the distinction between the words "potential" and "may" that Respondents apparently find.
[2] Because this issue is not before us, we make no determination here as to whether the Commission has the authority to override the "temporary and minimal" mandate of N.C. Gen.Stat. § 113A-57(1) by granting the Director the authority to approve land-disturbing activities within the buffer zone that are not temporary or minimal through the enactment of an administrative regulation.
[3] Assuming arguendo the dissent's construction of the definition of "land-disturbing activities" is correct in its second footnote, our analysis is unchanged. Our use of the word "maintenance" was not meant to invoke N.C. Gen.Stat. § 113A-52(6). Our abridged citation to the definition of "land-disturbing activities" above, does not include the word "maintenance," because we do not find it relevant to the definition on these facts. We hold that the activities Mountain Air will continue to perform constitute "land-disturbing activities" because they are a "use of the land by [a] person in ... commercial development... that results in a change in the natural cover or topography and that may cause or contribute to sedimentation." N.C. Gen.Stat. § 113A52(6).
[4] The sentence the dissent relies on is preceded by the following language: "The sedimentation of streams, lakes and other waters of this State constitutes a major pollution problem. Sedimentation occurs from the erosion or depositing of soil and other materials into the waters, principally from construction sites and road maintenance. The continued development of this State will result in an intensification of pollution through sedimentation unless timely and appropriate action is taken. Control of erosion and sedimentation is deemed vital to the public interest and necessary to the public health and welfare[.]" N.C. Gen.Stat. § 113A-51.
[5] With the potential exception when express written permission is given by the Director of the Division of Land Resources, and with the further exception when the land-disturbing activity falls under the express exemption in N.C. Gen.Stat. § 113A-57(1) involving "construction of facilities to be located on, over, or under a lake or natural watercourse."
[6] 15A N.C.A.C. 4B.0125(c) provides that "[w]here a temporary and minimal disturbance is permitted as an exception by G.S. 113A-57(1), land-disturbing activities in the buffer zone adjacent to designated trout waters shall be limited to a maximum of ten percent of the total length of the buffer zone within the tract to be distributed such that there is not more than 100 linear feet of disturbance in each 1000 linear feet of buffer zone. Larger areas may be disturbed with the written approval of the Director." (Emphasis added). The "Director" the regulation is referencing is the Director of the Division of Land Resources. See N.C. Gen.Stat. § 113A-54.1(c) (2007). In the instant case, the Director of the Division of Land Resources was James D. Simons. However Simons delegated this authority to Francis M. Nevils, Jr., Section Chief, Land Quality Section. Therefore, Mountain Air was required to have and received Nevils' written approval before disturbing more than ten percent of the buffer zone located at Banks Creek.
[7] The definition of "land-disturbing activities" references the word maintenance. See N.C. Gen.Stat. § 113A-52(6) ("[A]ny use of the land by any person in residential, industrial, educational, institutional or commercial development, highway and road construction and maintenance that results in a change in the natural cover or topography and that may cause or contribute to sedimentation.)" However, the structure of this sentence makes it clear that the maintenance it is referring to is highway and road maintenance, not maintenance in general.
[8] In his deposition, Nevils testified that in the two years prior to the issuance of the variance to Mountain Air, respondent had issued "four or five" trout buffer variances and that there were a number under review at that time. Nevils further testified that at least one of the variances previously issued was comparable to the one issued to Mountain Air.